# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* FERRANTI, Minor.

UNPUBLISHED
May 10, 2018

No. 340117; 340118
Otsego Circuit Court
Family Division
LC No. 13-000071-NA

Before: SHAPIRO, P.J., and M. J. KELLY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father and respondent-mother appeal as of right the trial court's order terminating their parental rights to their minor daughter, JF, under MCL 712A.19b(3)(c)(*i*) (the conditions that led to the adjudication continue to exist), and (g) (the parent is unable to provide proper care and custody). We affirm.

JF has significant medical needs; she has spina bifida, stage 3 chronic kidney disease, and neurogenic bladder. As a result of her medical conditions, JF has a stoma in her umbilicus to catheterize her bladder for emptying and a stoma to flush her bowel. JF's catheter needs to be regularly maintained in a sanitary environment because, due to her paralysis, she would not know if she had a urinary tract infection (UTI). To monitor JF's condition—and to ensure that any UTI is identified quickly—regular blood and urine tests are necessary.

On October 29, 2015, Child Protective Services (CPS) worker Amy Croff filed a petition to remove JF from her home and place her in the care, custody, and supervision of petitioner, Department of Health and Human Services (DHHS). At an emergency hearing held on the day that the petition was filed, Croff testified that the original complaint concerned the conditions in the home. Croff described the family home as very cluttered. Along with the two respondents, JF lived with her three older siblings. The family had one cat, three kittens, and a dog. The family lived in a mobile home, and JF usually crawled on the floor because it was difficult to maneuver her wheelchair. According to Croff, there were cat feces on the floor of the home, a urine smell throughout the home, and fecal matter all over the bathroom that JF shared with her three siblings. Croff had concerns about JF crawling on the floor given the animal feces and

-1-

urine on the floor.[1]  Croff also expressed concern about JF's hygiene.  When Croff met with JF at her school, JF had grime on her chest and neck and smelled strongly of body odor and urine, and the school told Croff that JF's body odor was a continual problem.

Croff testified that the petition was also based on concerns that JF's medical needs were not being adequately addressed.  Croff was informed by JF's school that catheters were not being provided.  Croff also testified that JF had missed numerous medical appointments that were crucial to sustaining JF's physical health.  Croff testified that JF had not seen a urologist since November 2014—even though she was supposed to have follow-up visits every six months—and that JF's prescription medication had not been refilled.

According to Croff, the family had an extensive history with CPS.  JF had been previously removed from the home due to the home conditions and medical neglect in September 2013.  JF was returned home in August 2014 with services put in the home for three months.  The family had previously participated in foster care services, ongoing CPS cases, CPS investigations, had Families First and Northern Families Intervention Services (NFIS) programs in the home, counseling service, medical transportation, food assistance, adult service assistance, food pantry referrals, gas cards, and housing assistance.

Respondent-father testified that JF bathed every night while in his care, but, because of the spina bifida, "she's going to smell like urine no matter."  Croff testified, however, that when JF was in foster care during the 2013 case, she did not have a strong urine smell about her.  Respondent-father also admitted that "we're not the cleanest people . . . but the house gets cleaned at least once a week."  He explained that the urine smell in JF's bathroom was from the Pull-Ups that she wore at night, and he denied the existence of human feces all over the bathroom.  Respondent-mother testified that JF's bedding was washed daily.  At the conclusion of the emergency hearing, the trial court authorized DHHS to remove JF from the home, but instructed JF's lawyer-guardian ad litem (LGAL) to inspect the home.

At the continued hearing, JF's LGAL informed the court that JF's room was a "little disheveled" and had a "little odor of urine," but he did not see feces on the floor and overall found the home habitable and "suitable generally."  Croff testified that the home conditions had improved since her last visit—although it continued to have a urine odor—and that JF had a new mattress.

The trial court indicated that it had ongoing concerns regarding JF's medical care and that it wanted to hear from her doctor.  The court stated that "if cleanliness was the only things [sic], we wouldn't be [here]."

At the continued hearing, a nurse practitioner at the Pediatric Nephrology Department at the University of Michigan testified that JF has chronic kidney disease, a neurogenic bladder,

---

[1]  According to a nurse practitioner that testified during a later hearing, JF had lab work performed after the she was removed from respondents' home that revealed that she had a UTI caused by two organisms that typically inhibit the mouths of cats and dogs.

and a current UTI, which can decrease kidney function. The nurse explained that it was important for JF to be seen every three to four months for lab work to determine her kidney function and to have her blood pressure, growth, and weight monitored. The nurse testified that JF was prescribed Detrol, which is used to make catheterizing easier and help prevent infection, but that it had not been filled since March 2015. Croff testified that it was important for JF to keep up with her doctor appointments because JF needed regular ultrasounds to determine the size and function of her bladder and kidneys. Croff explained that, in the past JF's kidneys had swollen as the result of bladder pressure from not catheterizing properly.

Respondent-father testified that he did not feel that JF needed an aide at school to assist with catheterization and that the school had only contacted him twice for catheters. Respondent-father also stated that, as far as he knew, JF was taking her medication. According to respondent-father, the floors in the home were clean enough for JF to crawl and he did not consider the floors to be a health risk to JF. Respondent-father did not believe that there was any basis for the allegations in the petition and that he and respondent-mother were "doing their best."

The trial court found probable cause to continue the proceedings and set the matter for trial. After a dispositional hearing, respondents were ordered to participate with the parent-agency treatment plan, which required respondents to complete psychological evaluations, provide a clean home for JF, and meet JF's medical needs.

At a permanency planning hearing on October 18, 2016, JF's foster care worker, Michelle Klein, testified that she made monthly visits to respondents' home. The latest visit was three weeks before the hearing. Klein testified that she noticed that JF's bedroom was clean during that visit, but the bathroom was "deplorable," with urine on the floor, fecal matter on the toilet, and the shower, floor, and toilet appeared to have never been cleaned. Klein noted that JF used that bathroom during her visits. Klein also testified that she noticed the smell of cat urine from cats urinating on piles of clothing on the floor. According to Klein, her review of the file showed a history of similar conditions in the home for 25 years. The previous service provider reports stated that respondents were cooperative, but the home conditions never changed, with reports of cat and dog feces throughout the home. Klein did not feel that respondents had made any substantial progress on improving the conditions of the home. She testified that the condition of the home had not changed over the course of the year, and that the last 30 days of improvement was not enough to reconsider termination. Klein noted that conditions in the home had improved just before JF was returned home in 2014, but then "went right back to the way they were before." She testified that the agency could provide no services that had not already been provided, and recommended termination of respondents' parental rights.

Matthew Lorence, the foster care monitor in this case until September 2015, testified in part as follows:

> There are—since 1991 have they been involved with the Agency and a repetitive stance through all the CPS investigations is the same conditions of the home. . . . These conditions, based on what we have is a very medically fragile child, the home conditions have a direct bearing to her overall health. With the stage three kidney disease, the medical treatment provided by U of M is there to—they're

trying to sustain it as long as possible for her, and to prevent it from occurring to the next stage, which would then require surgery and possible transplant. They're trying to preserve what she has left at this time. Another thing is that from the previous foster care case with [JF] to where we are now, the conditions, the allegations are the same. Again, it falls back to the home condition, medical appointments not being maintained. These are not something that can be missed. With these appointments, you're talking specialized medical health services and they are required for [JF's] care and well-being, and if these appointments are not followed through with or maintained on the basis of the doctors and of their recommendations, I mean, it does have an overall direct bearing and that's why we're here today.

Lorence agreed with the DHHS recommendation to file a termination petition.

Respondent-father testified that he and respondent-mother were capable of taking care of JF's needs and that "at this moment, the house is clean enough." He said that JF was older and better at monitoring her medical needs. Respondent-father did not feel that it was his responsibility to clean the bathroom, but he would make sure the bathroom stayed clean.

The LGAL stated that he visited the home the previous day and the house and bedroom were sufficient. He said the bathroom was "minimal" and possibly was "just an older bathroom."

The trial court authorized the filing of a petition to terminate respondents' parental rights. The court informed the parties that "I suspect I'm going to want to see the house." During a later status conference, the trial court reaffirmed that it wanted to see the home "because that's a crucial issue in this case." In February 2017, the court, along with respondents' attorneys, petitioner's attorney, the LGAL, and a caseworker, visited the home.

In November 2016, the DHHS filed a supplemental petition for termination of parental rights, and the termination hearing commenced on May 10, 2017. At the hearing, Tim Strauss, a limited license psychologist, testified that he performed a parental fitness evaluation on each respondent in April 2016. Strauss found it noteworthy that each respondent "had a significant odor that filled the examination room" because people who come in for parental fitness evaluations usually "try to put their best foot forward . . . to present themselves in the most favorable light they can." Strauss stated that "when both of these parents came in with the body odor, especially when they knew the concerns were about health and physical neglect, it raises the question about—if they can't take care of their own health or cleanliness, it raises the question of if they can do it for their children." Strauss recommended that both parents work with Families First and participate in conjoint counseling. Struass's concern was that both parents' health and mood concerns would cause them to become fatigued and to anticipate that the other parent would take care of things, and in conjoint counseling the parents could come up with a specific list of parenting duties and develop a schedule and rhythm of routine.

Christina Pudvan, the foster care worker during the 2013-2014 case, outlined the extensive services that were provided at the time the 2013 case was closed. Pudvan testified that the parents received services through the Family First Support Program, NFIS, and intensive

counseling services. Pudvan stated that she visited the family home in 2013 and found the condition of the home to be the worst she ever saw during her career, with dirt and debris on the floor and an odor throughout the home. During the time the 2013 case was open, JF's medical needs were an ongoing concern that had to be addressed constantly. After JF returned home in August 2014, CPS received complaints in September and October 2014 because of "hygiene and cleanliness, the medical concerns." Pudvan had meetings at the school about cleanliness and JF smelling of urine. When the case closed in November 2014, issues continued to exist with hygiene and cleanliness, but the parents were meeting JF's needs as far as attending her medical appointments by then.

Klein testified that she prepared a parent-agency treatment plan that recommended parenting classes and psychological evaluations for respondents. Klein testified that respondents were initially reluctant to participate in services and, as of June 7, 2016, had not made an appointment to begin counseling. Respondents began counseling in July 2016, but their attendance was sporadic. According to Klein, the parents "did not feel they needed that service or that it was going to help them," and "[t]hey had stated that the condition of their home was not going to change and that they did not feel they were going to live up to our expectations."

Klein testified that she was in the home on a monthly basis and the condition of the home varied. Klein reiterated her earlier testimony about the cluttered condition of respondents' home, the unsanitary condition of the bathroom, and the smell of urine in the home. According to Klein, the home always had an odor of cat urine, but the condition of the home improved "toward the end." However, Klein noted that during a visit in December 2016, the condition of the bathroom was "horrible." According to Klein, "[t]here was dried feces, urine all on the floor, around the toilet, on the back of the toilet seat, and [she] told [respondent-father] that was just unacceptable," and he "said that he did not go in that bathroom very often and he was disgusted with that as well." Klein did not know of any other services that could be provided that had not already been provided.

Respondent-father testified that DHHS was involved in this case because they received complaints that JF smelled of urine, and that she would likely always have a urine odor about her based on the research he performed on WebMD. However, respondent-father acknowledged that JF did not have a urine or body odor during his visitation with her while she was living with a foster family. He testified that JF has a strong emotional bond with the family. According to respondent-father, the family lived in a single-wide mobile home. He stated that "[w]e're not the perfect family" and that it was "hard to keep a lot of things clean and uncluttered due to five people being in the home." Respondent-father testified that it was difficult for JF to maneuver the wheelchair in the home and her solution was to get out of the chair and crawl through the house. He testified that he understood the importance of keeping the floor clean because of JF's crawling and that "lately it's been a good cleaning once a week." He said that his son had purchased a "very good vacuum cleaner." Respondent-father acknowledged that JF's bathroom "has been unsanitary" at times, but stated that he would clean the bathroom every day if JF was in the home. Respondent-father's counsel asked respondent-father if he wanted the trial court to interview JF before making a determination on termination, and respondent-father replied, "I would ask that, yes."

At the conclusion of testimony, the trial court noted that it was inclined to speak with JF and asked if either party had an objection or opposition. Petitioner's counsel stated that she did not "necessarily have a problem with it," and respondent-father's counsel stated, "I would actually request it . . . in this particular case because there is such a strong bond with the family, and that bond, part of it is because of [JF's] needs through her entire life." Respondent-mother's counsel responded, "We don't object," and "[w]e encourage the court to talk with [JF]." The LGAL responded, "I have no objection, your Honor, and I would just add for the record having interviewed her [a] number of times, she is competent to do so, even though she is 13 or 14 years old." The court indicated that it would interview JF on July 5 before closing arguments, and it did so.

After closing arguments, the trial court indicated that it would issue a written opinion. The trial court eventually issued a written opinion and order terminating respondents' parental rights under MCL 712A.19b3(c)(*i*) and (g).

On appeal, respondents first argue that the plea proceeding in which the trial court assumed jurisdiction was defective and violated their due process rights. However, respondents waited until the conclusion of the termination hearing to challenge the propriety of the trial court's jurisdiction. Absent certain exceptions, a trial court's exercise of jurisdiction over a child must be challenged in a direct appeal from the initial dispositional order. See MCR 3.993(A)(1).[2] The court's jurisdictional decision cannot be collaterally attacked when "termination occurs following the filing of a supplemental petition for termination after the issuance of the initial dispositional order." *In re SLH*, 277 Mich App 662, 668; 747 NW2d 547 (2008); see also *In re Hatcher*, 443 Mich 426; 505 NW2d 834 (1993). Exceptions have been recognized when a trial court exercises jurisdiction under the "one-parent doctrine," *In re Kanjia*, 308 Mich App 660, 669; 866 NW2d 862 (2014), and when the trial court fails to *both* timely appoint counsel and "to advise the respondent that his plea could later be used in a proceeding to terminate his parental rights," *In re Mitchell*, 485 Mich 922; 773 NW2d 663 (2009). These exceptions do not apply in the instant case. Respondents received an adjudication and were represented by counsel, and they could have filed a direct appeal. Because respondents cannot collaterally attack the trial court's exercise of jurisdiction in the instant appeal, appellate review of this claim of error is foreclosed.

---

[2] As relevant to this case, MCR 3.993(A)(1) provides that "an order of disposition placing a minor under the supervision of the court or removing the minor from the home" is appealable as of right. Respondents argue that JF was removed from the home following the initial inquiry and, citing *In re McCarrick/Lamoreaux*, 307 Mich App 436, 458; 861 NW2d 303 (2014), they argue that they did not have an appeal as of right from that order. They contend, therefore, that this appeal is their first appeal as of right. Respondents correctly note that a parent may only appeal as of right an order of disposition, not merely an order removing a child from the home. *Id*. at 445. Thus, respondents did not have an appeal as of right from the order taking JF into protective custody. However, they did have an appeal as of right from the initial dispositional order, MCR 3.993(A)(1), which was eventually entered after JF's removal.

Next, respondents argue that the trial court erred by personally visiting and viewing their home. Respondents failed to preserve this error, so our review is limited to whether the error affected substantial rights. *In re Utrera*, 281 Mich App 1, 8; 761 NW2d 253, 260 (2008). "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id*. at 9. While we agree that the trial court erred by personally visiting and viewing respondents' home, we conclude that reversal is not warranted because respondents have not demonstrated that the error affected their substantial rights.

Given the varying descriptions of respondents' home, the trial court informed the parties that "I suspect I'm going to want to see the house." The court stated that "[i]t's not going to be an unannounced situation." The court stated:

> Ms. Klein, I would want you there, so come testimony time you would be able to say this is how the house looked on that day as compared to other days when you've been there. You wouldn't be able to say anything right when I would be there, and obviously the parents would be there as well, and but that will happen once we get a termination date scheduled and a petition filed. . . . The attorneys would be invited for that, but I would like to see it. That would help me in this case.

During two later hearings, the court repeated that it intended to visit the home. During the December 6 status conference, the court stated:

> What I wanted to do was see the premises. I think I remember [the LGAL's] report, but so I want to set up a time to view it. That would be a time when just— since it's part of the trial, things can't be explained to me at that time that this is so-and-so's room or this is so-and-so's room. When you get back in court, that can happen then. You can say, you know, "When you saw this room, which was off to the left, that's where things are."

During the January 10, 2017 status conference, the court stated that "I want to see it so I can— because that's a crucial issue in this, and just remember the ground rules." The trial court, along with respondents' attorneys, petitioner's attorney, the LGAL, and a caseworker, visited the home in February 2017.

In the court's opinion and order, with respect to the statutory grounds for termination, the court summarized the witnesses' testimony at the termination hearing and made no mention of its observations during its visit to respondents' home. The court found that termination of parental rights was warranted under MCL 712A.19b(3)(c)(*i*) because, in part,

> The conditions that led to the adjudication, lack of medical care for [JF], very unhygienic household circumstances, and a lack of or inability to create hygienic conditions for [JF] still exist. Given the long history, there is no reasonable likelihood that they will be rectified any time soon.

The court also found that termination of parental rights was warranted under MCL 712A.19b(3)(g) because respondents, without regard to intent, "failed to provide proper care or custody for [JF] for the reasons outlined [with respect to § 19b(3)(c)(*i*)], and there is no

-7-

reasonable expectation that this will be corrected." The court then found that it was in JF's best interests to terminate respondents' parental rights, stating in pertinent part:

> Moreover, the home environment of the parents has never been particularly clean. The many professionals unanimously agreed that the house was unhygienic and was probably not going to improve. It is not as atrociously bad as it was, *but even when the court viewed the situation, it is not where a person with Spinal [sic] Bifida will thrive.* [JF] chooses to crawl for locomotion when she is in the home and the home will never be clean enough for her to avoid infections. [Emphasis added.]

Petitioner does not appear to dispute respondents' argument that the trial court did not have authority to conduct a home visit to view the condition of respondents' home. Even if it did, such argument would be meritless. MCR 3.901(A)(1) sets forth the court rules that are applicable to child protective proceedings. The rule pertaining to the court's view of "property or a place where a material event occurred," MCR 2.507(D), is not among the rules specifically incorporated into juvenile or child protective proceedings.[3] Moreover, MCR 3.901(A)(2) declares that "[o]ther Michigan Court Rules apply to juvenile cases in the family division of the circuit court only when this subchapter specifically provides." In addition, MCR 3.923(A) provides that if the court believes that the evidence has not been fully developed, the court may (1) examine a witness, (2) call a witness, or (3) adjourn the matter before the court, and (a) cause service of process on additional witnesses, or (b) order production of other evidence. The rule does not recognize a court's authority to personally view or visit a particular place or property. In sum, there is no statutory provision, court rule, or caselaw that permits a trial court in a juvenile proceeding to view a child's home.

Respondents argue that this error affected their substantial rights because the court relied on its observations when determining that it was in JF's best interests to terminate respondents' parental rights. They contend that because the court did not create a record of its findings, they did not know which findings were important to rebut and had no meaningful way to challenge the court's conclusion that the home "is not where a person with Spinal [sic] Bifida will thrive." They also contend that this Court's review is limited by the trial court's failure to create a record of its findings.

However, we recognize that the trial court could have ordered the parties to introduce photographic evidence of respondents' home to show the condition of the home, MCR 3.923(A)(3)(b), but instead viewed the home in-person with the caveat that the parties could not talk to the court during the visit or explain anything that the court was observing. Because respondents and their counsel were present during the viewing and aware of what the court was observing, and because the trial court allowed the parties to provide explanations to the court through testimony on the record after the viewing, the court's viewing of respondents' home did not violate respondents' due process rights. Further, given the trial court's reliance on the

---

[3] Whether this rule would allow a trial court to view a place for the purpose of resolving a disputed question of fact need not be considered in the context of this case.

-8-

testimony of witnesses who described both the historical condition of the home, the services provided, and the current condition of the home, as well as the effect of the condition of the home on JF's medical condition, it does not appear that the trial court's visit to the home affected the outcome of the proceedings. The court found that "the many professionals unanimously agreed that the house was unhygienic and was probably not going to improve" even though the condition of the home was "not as atrociously bad as it was." The trial court's lone reference to the court's viewing of the home was that

> it is not where a person with Spinal [sic] Bifida will thrive. [JF] chooses to crawl for locomotion when she is in the home and the home will never be clean enough for her to avoid infections.

This finding is amply supported by the testimony of the witnesses with respect to the condition of the home and its effect on JF's medical condition, and the trial court's statement regarding its view of the home reflects that the court's viewing of the home confirmed the witnesses' testimony. Under these circumstances, respondents have failed to demonstrate that the trial court's error in visiting the home affected their substantial rights.

Respondents next challenge the trial court's interview of JF. Respondents cite to *In re HRC*, 286 Mich App 444, 453; 781 NW2d 105 (2009), in which this Court concluded that "a trial court presiding over a juvenile proceeding has no authority to conduct in camera interviews of the children involved" and that it was plain error for the trial court to do so. However, both respondents consented to the interview; respondent-father's counsel stated, "I would actually request it," and respondent-mother's counsel stated, "We encourage the court to talk with [JF]." A "[r]espondent may not assign as error on appeal something that she deemed proper in the lower court because allowing her to do so would permit respondent to harbor error as an appellate parachute." *In re Hudson*, 294 Mich App 261, 264; 817 NW2d 115 (2011). Because the trial court solicited input from the parties before conducting the *in camera* interview and both parties affirmatively urged the trial court to conduct the interview, respondents waived their challenge to the court's *in camera* interview of JF. Respondents' waiver extinguished any error. *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

Respondents next challenge the trial court's determination that petitioner established statutory grounds for termination. "To terminate parental rights, a trial court must find by clear and convincing evidence that at least one statutory ground under MCL 712A.19b(3) has been established." *In re Moss*, 301 Mich App 76, 80; 836 NW2d 182 (2013). This Court reviews for clear error the trial court's determination that clear and convincing evidence supports a statutory ground for termination. *In re Williams*, 286 Mich App 253, 271; 779 NW2d 286 (2009). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004).

The trial court terminated respondents' parental rights pursuant to MCL 712A.19b(3)(c)(*i*) and (g), which authorize a court to terminate parental rights if it finds by clear and convincing evidence that:

(c) The parent was a respondent in a proceeding brought under this chapter, 182 or more days have elapsed since the issuance of an initial dispositional order, and the court, by clear and convincing evidence, finds either of the following:

(*i*) The conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

\* \* \*

(g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

Termination is appropriate under subsection (c)(*i*) when the conditions that brought the child into foster care continue to exist "despite time to make changes and the opportunity to take advantage of a variety of services." *In re White*, 303 Mich App 701, 710; 846 NW2d 61 (2014) (quotation marks and citation omitted). The statutory ground for termination under subsection (g) may be established by a parent's failure to participate in and benefit from services, which is evidence that the parent will not be able to provide the child with proper care and custody. *Id*. Additionally, "[a] lack of cooperation with reunification services, or other court-ordered conditions, can bear on a termination decision, if that lack of cooperation relates to issues of abuse or neglect." *In re LaFrance*, 306 Mich App 713, 729; 858 NW2d 143 (2014).

Respondents argue that the trial court clearly erred in finding that a statutory ground for termination had been established because the testimony showed that they had made progress in maintaining the cleanliness of their home and improved the attention they showed to JF's medical care and needs.[4]

The trial court made the following findings of fact and conclusions of law with respect to MCL 712A.19b(3)(c)(*i*):

---

[4] In arguing that the trial court erred in finding a statutory basis for termination, respondents challenge the trial court's finding that "many professionals unanimously agreed that [respondents] house was unhygienic and was probably not going to improve." However, this finding was made in the context of the court's best-interest determination, not in the context of the court's findings regarding the statutory grounds for termination. Additionally, respondents' contention that the trial court relied on testimony from caseworkers who had not viewed respondents' home in years, and that the court ignored testimony regarding the condition of the home at a point in time nearer the termination hearing, is misplaced. Rather, the trial court in its written opinion began by summarizing the testimony of each of the witnesses that testified at the termination hearing, and then made its findings of fact and conclusions of law.

-10-

The initial dispositional order in this matter took place January 12, 2016, so 182 or more days have elapsed since that time. The conditions that led to the adjudication, lack of medical care for [JF], very unhygienic household circumstance[s], and a lack of or inability to create hygienic conditions for [JF] still exist. Given the long history, there is no reasonable likelihood that they will be rectified any time soon.

With respect to MCL 712A.19b(3)(g), the court made the following finds of fact and conclusions of law:

A second provision under which termination is sought is MCL712A.19b3(g) [sic], which provides for termination if the parent without regard to intent fails to provide proper care or custody for the child and there is no reasonable expectation that it will be provided. This is similar to the first provision. [Respondents] have failed to provide proper care or custody for [JF] for the reasons outlined above, and there is no reasonable expectation that this will be corrected.

Because the trial court found it appropriate to terminate respondents' parental rights under both MCL 712A.19b(3)(c)(*i*) and (g) on the basis of medical neglect and the unhygienic household conditions, we address these provisions together.

In challenging the trial court's findings under these provisions, respondents' argument first focuses on the trial court's conclusion that they would not be able to provide a hygienic environment in light of JF's medical condition. They contend that they cleaned and maintained the home and that the trial court's finding was therefore unsupported in the record. In this case, 20 months had elapsed since JF's removal from the home, and the overwhelming evidence established that the main area of the home was cluttered and dirty and that JF's bedroom and bathroom had clutter, was dirty, was littered with feces on the floor, and smelled of cat and human urine. The condition of the main areas of the home varied during the caseworker's monthly visits, but the conditions had changed only minimally by the time of the termination hearing. It was not until petitioner requested a permanency planning hearing that respondents first cleaned JF's bedroom, and yet during an unannounced visit in December 2016, the condition of JF's bathroom was "horrible." According to a family support worker who was in the home weekly, respondents made progress in "picking up" the main area of the home, but JF's room was filled with clothing on the floor and smelled strongly of urine, and the bathroom was very dirty with soap scum, and urine and feces on the floor and toilet. The worker informed respondents of the necessity of having a hygienic bathroom for JF to use because of her medical condition and that the unsanitary conditions in the home would prevent reunification with JF, but on the last day of services in the home, the bathroom and bedroom "did not look like anything had been done." The unsanitary condition of respondents' home was an ongoing issue, which had previously prompted CPS's involvement and JF's removal from the home in the 2013 case. Yet despite exhausting all available services, the problem persisted, and respondents remained unable to provide proper care and custody for JF given her substantial medical needs. This Court has repeatedly recognized that it is not enough to participate in services; a parent must also benefit from the services provided in order to address the problems leading to the adjudication. *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012). We conclude that the trial court did

not clearly err by finding that statutory grounds for termination under MCL 712A.19b(3)(c)(*i*) and (g) were established by clear and convincing evidence.[5]

Lastly, respondents challenge whether termination of their parental rights was in JF's best interests. A trial court must order termination of a respondent's parental rights if the court finds by a preponderance of the evidence based on the entire record that termination is in the child's best interests. *In re White*, 303 Mich App at 713. This Court reviews the trial court's determination of a child's best interests for clear error. *Id*.

A trial court must weigh all of the evidence in making a best-interest determination. *Id*. The court may consider many factors, including "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home," as well as "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 713-714 (quotation marks and citation omitted).

The trial court found that termination of respondents' parental rights was in JF's best interests because of the risks to JF's health associated with the unhygienic condition of the home and respondents' inability to provide the care and attention that JF's medical condition required. Specifically, after noting that the family was intact and appeared to be close, the court found in pertinent part as follows:

> [JF's] sister has indicated she will assist with the hygienic procedures necessary, and her father, who is disabled but reasonably healthy, has said he will do whatever it takes. However, throughout this case, even from its inception, this has continued to be a problem. It gets marginally better, but then gets worse. [JF] is becoming a young lady. While she is able to do more self-care, one of her father's remarks was telling. He indicated that [JF] would always have an odor. That does not appear to be the case in her foster home, where [JF] has bonded strongly. Moreover, the home environment of the parents has never been particularly clean. The many professionals unanimously agreed that the house was unhygienic and was probably not going to improve. It is not as atrociously bad as it was, but even when the court viewed the situation, it is not where a person with Spinal [sic] Bifida will thrive. [JF] chooses to crawl for locomotion

---

[5] Respondents assert that they made progress with respect to JF's medical needs. At the time JF was removed from the home, she had not been regularly attending her necessary medical appointments and her prescription medications had not been filled. She also suffered from a UTI that was caused by bacteria typically found in the mouths of cats and dogs. Although respondents attended JF's medical appointments during the time that JF was in foster care in this case, those appointments were scheduled by the foster parent and JF was transported to the appointments by the foster parent. Under these circumstances, we continue to conclude that the trial court did not clearly err by finding that clear and convincing evidence supported termination of respondents' parental rights under MCL 712A.19b(3)(c)(*i*), and (g).

when she is in the home and the home will never be clean enough for her to avoid infections. [JF] needs attention all the time and her family does not seem to be able to provide it. Moreover, she has a strong bond where she currently is.

The evidence demonstrates that JF was bonded to respondents and her siblings. Respondents were partially in compliance with their treatment plans but, despite being provided with numerous services, did not demonstrate an ability to maintain a hygienic condition in their home and to properly care for JF irrespective of their compliance with the treatment plan. There is no dispute that JF requires a sanitary and hygienic area in which to catheterize and perform bowel flushes, yet the overwhelming testimony demonstrated that the conditions of JF's bathroom remained "deplorable." The past CPS involvement with respondents reveals that the unhygienic condition of the home has been an issue for nearly 25 years and that respondents failed to benefit from services to address this condition when JF was removed from the home in 2013. JF returned to the home in August 2014, and by September 2014 petitioner was again receiving complaints about JF's hygiene. The previous case was closed in November 2014, and respondents thereafter failed to regularly refill JF's medication and failed to take her to necessary medical appointments. The home conditions did not improve. By October 2015, JF was again removed from the home for the same unhygienic living conditions and medical neglect. In addition, while in foster care, JF did not smell of urine, her medical needs and appointments were attended, and she was bonded with her foster parent. In light of these factors, the trial court did not clearly err when it concluded that termination of respondents' parental rights was in JF's best interests.

Affirmed.

/s/ Douglas B. Shapiro
/s/ Michael J. Kelly
/s/ Colleen A. O'Brien

-13-